MICHAEL COLEMAN,
          Plaintiff,

v.

ESTATE OF SALEH OBAISI,
          Defendant.

)
)
)
)
)
)
)
)
)

No. 16-cv-04917

Judge Edmond E. Chang

## MEMORANDUM OPINION AND ORDER

Michael Coleman brings this civil-rights lawsuit against Saleh Obaisi, the former Medical Director at Stateville Correctional Center, for allegedly violating Coleman's right against cruel and unusual punishment under the Eighth Amendment.[1] R. 31, Am. Compl.[2] According to Coleman, Dr. Obaisi was deliberately indifferent toward Coleman's chronic pain issues when Coleman was incarcerated at Stateville.[3] Obaisi has now moved for summary judgment. R. 82. For the reasons explained below, the motion is granted.

## I. Background

The facts narrated here are undisputed unless otherwise noted. Coleman has been incarcerated at Stateville Correctional Center since 2003. R. 84, DSOF ¶ 1.[4] In

---

[1]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331.

[2]Citations to the record are noted as "R." followed by the docket number.

[3]After Obaisi's death in December 2017, the Court granted Coleman's motion to substitute Ghaliah Obaisi, Independent Executor of the Estate of Dr. Saleh Obaisi, in lieu of Obaisi himself. R. 62. But for purposes of this motion, the Opinion will continue to refer to the Defendant as Dr. Obaisi or Obaisi.

[4]Citations to the parties' Local Rule 56.1 Statements of Fact are as follows: "DSOF" for Obaisi's Statement of Facts [R. 84], "Pl. Resp. DSOF" for Coleman's response to Obaisi's

2011, shortly before the events of this case, Coleman fell down a set of stairs while he was using a crutch.[5] *Id.* ¶ 9. As a result of the fall, Coleman began experiencing pain in his right knee. *Id.* With that knee injury, so began more than six years of pain and near-countless medical appointments with both Dr. Obaisi as well as various orthopedic specialists. A rough timeline of those visits follows.

The first time Coleman met Dr. Obaisi was in August 2012, shortly after Obaisi had become the Medical Director at Stateville. DSOF ¶¶ 2, 9. During that initial visit, Coleman complained about pain in his right knee stemming from the 2011 fall. *Id.* ¶ 9. In response, Obaisi reviewed Coleman's medical history, including a December 2011 MRI record of Coleman's right knee, which showed that the fall had not resulted in any ligament tear. *Id.* Obaisi also performed his own physical examination of Coleman's right knee. *Id.* At the end of the visit, Obaisi diagnosed Coleman with a chronic knee sprain and prescribed him a non-steroidal anti-inflammatory drug (often referred to as an "NSAID" in medical jargon) called Naprosyn to address the pain. *Id.* Obaisi also renewed Coleman's medical permits for a low bunk, low gallery, crutch, and right knee brace. *Id.*

The next month, in September 2012, Coleman saw Dr. Obaisi again for a follow-up visit. DSOF ¶ 11. This time, Coleman complained of pain in his lower back as well as pain in his right knee. *Id.* After performing a physical examination, Obaisi

Statement of Facts [R. 93], "PSOF" for Coleman's Statement of Additional Facts [R. 91], and "Def. Resp. PSOF" for Obaisi's response to Coleman's Statement of Additional Facts [R. 95].

[5]Coleman was using a crutch because he had undergone knee surgery at the University of Illinois at Chicago Medical Center in December 2010. DSOF ¶ 8. The procedure involved a minor shaving of his cartilage, which is not meant to produce pain. *Id.* At the time of the surgery and subsequent fall, Dr. Obaisi was not yet employed at Stateville.

diagnosed Coleman with chronic bursitis and lower back pain. *Id*. Obaisi also ordered an x-ray to be performed on Coleman's right knee and lumbar spine. *Id*. The x-ray results came back showing a "bipartite patella in the left knee and minor degenerative changes in Plaintiff's lumbar spine."[6] *Id*. It is undisputed that a "bipartite patella is a normal, painless anatomical variant" that "requires no treatment." *Id*. Degenerative changes in the lower back are also quite common. *Id*. At this point, Obaisi offered Coleman a steroid injection for his right knee, but Coleman refused. *Id*.

Coleman returned for a third visit with Dr. Obaisi in December 2012. DSOF ¶ 13; R. 92, Pl. Resp. DSOF ¶ 13. During this appointment, Obaisi diagnosed Coleman with chronic right knee pain and advised him to follow-up on an as-needed basis. DSOF ¶ 13. A few months later, in April 2013, Coleman saw Obaisi again, and Coleman again complained of right knee pain and low back pain. *Id*. ¶ 14. This time, Obaisi gave Coleman a prescription for Motrin (another NSAID) for his low back pain. *Id*. Obaisi also told Coleman that he would be referred for an orthopedic evaluation for his right knee pain. *Id*.

Then, in July 2013, Coleman met with a different physician at Stateville named Dr. Ann Davis. DSOF ¶ 15. Coleman presented the same complaints about back pain, so Davis administered him an injection of Toradol (an NSAID) and also

---

[6]The "left" knee appears to be a typo by the parties. Coleman's patient chart clearly states that the x-ray was taken of the "R Knee," meaning right knee, and also shows that the bipartite patella was in the right knee. Coleman Medical Records at 8.

prescribed Prednisone (a steroid used to reduce pain and inflammation) and Naproxen (another NSAID). *Id*.

A few days after the visit with Dr. Davis, Coleman had an offsite orthopedic consultation with Dr. Samuel Chmell at the University of Illinois at Chicago Medical Center. DSOF ¶¶ 8, 16. At the consultation, Chmell reviewed Coleman's latest MRI results (that Obaisi also had reviewed in August 2012), "which revealed no new abnormalities." *Id*. ¶ 16. Chmell also performed a physical examination of Coleman's right knee and noted "no instability or decrease in range of motion." *Id*. Chmell then administered a steroid injection into Coleman's right knee and recommended that a repeat MRI be conducted. *Id*. In addition, Chmell recommended a follow-up visit in four to six weeks. PSOF ¶ 16. Specifically, Chmell made a note in Coleman's patient chart that "we will follow up with him in about 4-6 weeks' time after he has obtained all his imaging." R. 84-4, DSOF, Exh. 4, Coleman Medical Records at 13-14. In the meantime, Chmell advised Coleman to "remain on crutches, and to use a knee sleeve, which is a supportive garment." DSOF ¶ 16.

A few days after Coleman's orthopedic consultation with Dr. Chmell, Dr. Obaisi renewed Coleman's medical permit for a low gallery, two crutches, and a right knee brace. DSOF ¶ 17. Obaisi also obtained approval for an MRI of Coleman's right knee, as well as approval for a follow-up appointment with Chmell. *Id*. In addition, Obaisi prescribed Coleman Mobic (another NSAID) as well as a muscle relaxer called Robaxin. *Id*.

Coleman eventually underwent the MRI of his right knee in October 2013 at Presence St. Joseph's Medical Center. DSOF ¶ 18. It is undisputed that the MRI revealed "minor post-meniscectomy changes,[7] as well as … no unstable fragments. These types of changes are common, and would have been expected to produce either minimal, or no knee pain." *Id*. Obaisi went over these MRI results with Coleman the following month, in November 2013. *Id*. ¶ 19. At that point, Obaisi recommended an abdominal binder to Coleman for additional support. *Id*.

Over the next several months, Coleman continued to receive the medications he had previously been prescribed and was additionally given Meloxicam (yet another NSAID), Prednisone, and Vicodin (an opioid) for a period of four days. DSOF ¶ 20. In April 2014, Coleman went to Dr. Obaisi again with the same complaints of knee and back pain. *Id*. 22. Obaisi ordered a second abdominal binder for him and also told Coleman he would refer him for another orthopedic evaluation. *Id*. That orthopedic consultation with Chmell was approved in May 2014. *Id*. ¶ 23.

In June 2014, Coleman again saw Obaisi, but this time he complained of pain in his right upper thigh and groin area. DSOF ¶ 24. Obaisi performed a physical examination and diagnosed Coleman with tendonitis of the right groin area. *Id*. To reduce pain, Obaisi administered a steroid injection to Coleman's left thigh.[8] *Id*. When Coleman returned for a follow-up visit the next month, in July 2014, Obaisi administered a second steroid injection to Coleman's right thigh. *Id*. ¶ 25.

---

[7]In December 2010, Coleman underwent a right knee arthroscopy with a partial medial meniscectomy. *See* Coleman Medical Records at 12.

[8]It is not clear if the parties meant to write "right thigh." Coleman's medical records are not legible on this point, but the DSOF says "left thigh." DSOF ¶ 24.

Coleman saw Dr. Obaisi again a month later, in August 2014. DSOF ¶ 26. During this visit, Coleman again complained of tenderness in his right groin area. *Id*. Obaisi performed a physical examination that revealed "no acute findings." *Id*. But Obaisi still prescribed Coleman another medication, Indocin (an NSAID). *Id*.

Coleman's groin pain continued. DSOF ¶ 27. In October 2014, Dr. Obaisi performed another physical examination of Coleman and diagnosed him with "tendonitis due to overuse of crutches and body twists." *Id*. As a result, Obaisi decided to discontinue Coleman's permit for crutches. *Id*. Obaisi also prescribed Coleman Tylenol #3, an opioid, for the pain. *Id*.

Then, in November 2014, three weeks after Dr. Obaisi ordered the discontinuation of the crutches, Coleman fell down the stairs again. PSOF ¶ 22. It is undisputed that on the day of the fall, Coleman was not using crutches. Pl. Resp. DSOF ¶ 29. It appears that somewhere at or near the top of the stairs, Coleman's right knee "went out," he lost his footing, and then he fell down the stairs. *Id*. As he was falling, Coleman tried to reach for a stair railing—but it was not there. *Id*. The parties dispute what exactly caused the fall—Coleman argues that the lack of crutches caused him to lose his balance and fall, while Obaisi maintains that it was the missing railing that caused him to fall. DSOF ¶ 29; Pl. Resp. DSOF ¶ 29.

After the fall, Coleman was transported via stretcher to the internal infirmary at Stateville, where Obaisi examined him. DSOF ¶ 30. To address Coleman's back pain, Obaisi administered an injection of Toradol (an NSAID) and renewed Coleman's Tylenol #3 prescription. *Id*. Obaisi also admitted Coleman to stay in the infirmary for

23 hours of observation. *Id*. The next day, Coleman was discharged from the infirmary. *Id*. ¶ 31. According to a nurse's note in Coleman's medical records, Coleman initiated the discharge when he stated that his back felt better, and he really wanted to go back to his cell, but Coleman denies making such a statement. *Id*.; Pl. Resp. DSOF ¶ 31.

Then, in January 2015, Coleman saw Dr. Chmell again, when he went to UIC Medical Center for an orthopedic evaluation of his right knee, low back, right groin, and right hip. DSOF ¶ 32. During this consultation, Chmell diagnosed Coleman with chronic right knee, right hip, and right groin pain. *Id*. Chmell then recommended an MRI as well as x-rays of Coleman's right knee and hip. *Id*. There is a dispute about whether the x-rays were ever taken. Obaisi asserts that the x-rays came back "negative" for hip abnormalities, and the only knee indication was a "bipartite patella," which, as explained above, is a normal, painless condition that requires no treatment. *Id*. But the record citations provided by Obaisi do not show any x-ray results. Indeed, Coleman, maintains that x-rays were never taken, although he too fails to provide any record cites. Pl. Resp. DSOF ¶ 32.

In any event, a few days after the orthopedic consultation, Coleman saw Dr. Obaisi again. DSOF ¶ 33. Obaisi noted during this visit that Coleman was no longer experiencing pain in his right groin area. *Id*. Obaisi also renewed Coleman's Indocin prescription and scheduled him for another steroid injection, which took place two days after the appointment. *Id*.

In May 2015, Coleman returned to UIC to undergo an MRI of his right hip and right knee. The parties again dispute when exactly the MRI was taken; again, both parties failed to provide correct record citations. But it looks like Coleman did receive an MRI in May 2015. Coleman Medical Records at 37. The MRI of the right hip revealed "a muscular strain involving distal gluteal insertion that was suspected to be a 'tear.'" DSOF ¶ 34. The MRI of the right knee showed a "mid-grade chrondral malacia in the medial compartment." *Id.* ¶ 36.

That same month, Coleman had an initial physical therapy evaluation with a physical therapist named Jose Becerra. Becerra examined Coleman and noted that Coleman's complaints of pain were "suspect." DSOF ¶ 38. Nonetheless, Becerra recommended that Coleman undergo one or two physical therapy sessions per week for a period of four to six weeks. *Id.* It appears that Coleman attended additional physical therapy sessions on May 20 and May 25, Pl. Resp. DSOF ¶ 39, but then Coleman missed the next five appointments on May 28, June 2, June 11, June 18, and June 25, DSOF ¶ 39. Coleman contends that he missed at least one of those appointments due to a lockdown at the prison. Pl. Resp. DSOF ¶ 39. But in any event, Becerra chose to discontinue Coleman from physical therapy due to "lack of attendance." DSOF ¶ 39.

But Coleman did show up for an appointment with Obaisi in June 2015 to go over his May 2015 MRI results. DSOF ¶ 40. During that visit, Obaisi prescribed Indocin (the NSAID) and advised Coleman that he would be referred for another orthopedic follow-up evaluation. *Id.*

The orthopedic follow-up happened two months later, in August 2015, when Coleman met with Dr. Chmell again. DSOF ¶ 41. Chmell reviewed Coleman's most recent MRIs and performed a physical examination. For Coleman's knee pain, Chmell prescribed him Flexiril (a muscle relaxer) and Ibuprofen (an NSAID) and noted that he should be given the use of a bottom bunk. *Id.* For the hip pain, however, Chmell recommended that Coleman see a different orthopedic specialist "to further evaluate the suspected gluteus medius tear" in the right hip. *Id.*

Coleman then met with Dr. Obaisi in September 2015 to go over Dr. Chmell's evaluation. DSOF ¶ 42. Obaisi prescribed Coleman another muscle relaxer, as well as Ibuprofen again. *Id.* Coleman continued to receive medications on at least two occasions over the next several months. Pl. Resp. DSOF ¶ 42.

The following year, in May 2016, Coleman met with a new orthopedic specialist at UIC, Dr. Matthew Marcus, for another consultation for his hip and knee pain. DSOF ¶ 44. During that consultation, Marcus reviewed Coleman's MRI results, performed his own physical examination, and concluded that Coleman was suffering from a "small gluteus medius tear of the right hip." *Id.* With regard to Coleman's right knee, Marcus noted that "there is some cartilage wear but no meniscal injury." *Id.* Marcus administered another round of steroid injections into Coleman's right knee and hip and prescribed him physical therapy. Marcus also recommended that Coleman obtain x-rays of his right hip, pelvis, and knee and advised scheduling a follow-up appointment in one year. *Id.*

A few days after this appointment with Dr. Marcus, Coleman met with Dr. Obaisi to go over Dr. Marcus's findings. DSOF ¶ 46. Based on Dr. Marcus's recommendations, Obaisi referred Coleman to physical therapy again. *Id*. Obaisi also ordered x-rays of Coleman's right knee and hip; those x-rays came back "negative" for abnormalities in the knee and hip. *Id*. Coleman concedes that the knee and hip x-rays were normal, but notes (without any record citation) that the L3, L4, and L5 vertebral bodies were revealed to be abnormal. Pl. Resp. DSOF ¶ 46. *See* Coleman Medical Records at 52.

In September 2016, Coleman returned for a physical therapy session with Becerra. DSOF ¶ 47. It is undisputed that during this visit, Coleman refused physical therapy. *Id*. But the reason for his refusal is disputed. Dr. Obaisi asserts that Coleman wanted to defer physical therapy until his next orthopedic consultation at UIC, while Coleman explains that he refused physical therapy because he was in severe pain. DSOF ¶ 47; Pl. Resp. DSOF ¶ 47.

Finally, in May 2017, Coleman went back to UIC for a one-year-follow-up evaluation with Dr. Marcus. DSOF ¶ 50. Marcus reviewed Coleman's x-rays and conducted a physical examination, then noted: "[W]e do not see anything surgical that we could offer the patient at this time." *Id*. It is undisputed that "minor abnormalities of the gluteus medius virtually never require surgery," and in this case, Coleman's "abnormality was quite minor on MRI." *Id*. Coleman, however, claims that Marcus did recommend him for *nonoperative* management of his pain with Dr. El Shami, but that appointment was never scheduled. Pl. Resp. DSOF ¶ 50.

There is no dispute that over the course of these six or so years, Coleman filed multiple grievances with the prison about lack of medical treatment. PSOF ¶ 12.

## II. Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

At the summary judgment stage, the Court views the evidence in the light most favorable to Coleman, the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Coleman's allegations can generally be divided into two categories. First, Coleman argues that he "was subjected to delays that unnecessarily prolonged and exacerbated his pain." Pl. Resp. Br. at 4. Specifically, Coleman points to four alleged delays by Dr. Obaisi that, according to him, constituted deliberate indifference: (1) the April 2013 delay in securing an orthopedic consultation for Coleman; (2) the July 2013 delay in securing a follow-up orthopedic consultation for Coleman; (3) the January 2015 delay in conducting recommended imaging of Coleman's leg; and (4) the August 2015 failure to secure a recommended surgical consultation for him.[9] Second, Coleman also points to Dr. Obaisi's October 2014 decision to take away Coleman's crutches as another instance of deliberate indifference. Because the claim about the crutches is not rooted in a theory of delay, the Opinion will discuss the crutches in a separate section.

Prison doctors violate the Eighth Amendment when they act with "deliberate indifference to [the] serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on a deliberate indifference claim, a plaintiff must prove that he suffered from "(1) an objectively serious medical condition to which (2)

---

[9]To be clear, Coleman does not explicitly list these four instances as examples of delayed treatment. Rather, his response brief provides general arguments and case citations relating to deliberate indifference and delay, and then interspersed throughout the brief are examples of actions by Dr. Obaisi that Coleman takes issue with. These are the four periods of delay that the Court interpreted as supporting a delayed-treatment claim.

a state official was deliberately, that is subjectively, indifferent." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). In other words, there is both an objective and subjective element to deliberate indifference claims—the specific standard is whether the physician intentionally or recklessly disregarded a known, objectively serious medical condition that poses an excessive risk to an inmate's health. *Gonzalez v. Feinerman*, 663 F.3d 311, 313-14 (7th Cir. 2011). Thus, deliberate indifference requires more than mere negligence or medical malpractice. *Duckworth v. Ahmad,* 532 F.3d 675, 679 (7th Cir. 2008). Even *objective* recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known—is not enough. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (cleaned up).[10] Having said that, subjective recklessness can sometimes be based on an inference arising from a physician's treatment decision when the decision is so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).

To be clear, Dr. Obaisi is not insulated from liability simply because he provided *some* degree of treatment, no matter how cursory, to Coleman. So, for instance, Obaisi does not automatically win on summary judgment simply because he prescribed medication in response to Coleman's complaints of pain. Rather, the inquiry is whether the treatment provided was "*adequate* in light of the severity of

---

[10]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

the condition and professional norms." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (emphasis added). As the Seventh Circuit has explained, "deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers blatantly inappropriate medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering. *Id.* at 777 (cleaned up). Whether the length of delay is "tolerable depends upon the seriousness of the condition and the ease of providing treatment. [In some cases,] [e]ven a few days' delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference." *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) (cleaned up).

With this framework in mind, the Court will now turn to Coleman's specific allegations of deliberate indifference on the part of Dr. Obaisi.

## A. Treatment Delays

Coleman argues that he "was subjected to delays that unnecessarily prolonged and exacerbated his pain." Pl. Resp. Br. at 4. According to Coleman, his medical records "are replete with prolonged delays in treatment and follow-up to independent physician's recommendations." *Id.* at 6. These "delays in referrals coupled with the prison medical staff's apparent refusal to schedule follow up visits or consults," argues Coleman, "create multiple questions of fact appropriate for jury consideration." *Id.* Coleman's briefing does not neatly identify the precise treatment delays that he is challenging as Eighth Amendment violations. Accordingly, the Court will only

address the particular instances that Coleman specifically mentions in his briefing. Based on the Court's reading of the response brief, that comprises four incidents.

### 1. April 2013 Orthopedic Consultation

The earliest incident named by Coleman happened in 2013. Specifically, Coleman notes that Dr. Obaisi recommended that he see an orthopedic specialist for his knee pain in April 2013. Pl. Resp. Br. at 6 (citing DSOF ¶ 15). But Coleman was not able to secure an appointment with Dr. Chmell at UIC until July 2013, which amounted to a three-month delay. Pl. Resp. Br. at 6 (citing DSOF ¶ 16). This delay, argues Coleman, constituted deliberate indifference to his knee pain by Dr. Obaisi.

As discussed above, there is both an objective and a subjective element to deliberate-indifference claims. Here, Coleman has failed to put forth any evidence showing that Dr. Obaisi *subjectively* disregarded his pain. It is undisputed that, during Coleman's April 2013 visit with Obaisi, Coleman complained of both low back pain and right knee pain. DSOF ¶ 14. During that appointment, Obaisi gave Coleman a prescription for Motrin (an NSAID). *Id*. Obaisi also told Coleman that he would be referred for an orthopedic evaluation to address his right knee pain. *Id*. But there is no allegation that Obaisi was *personally* responsible for the later three-month delay in securing the specialist consultation. Coleman's patient chart for the April 2013 visit with Obaisi includes a note by Dr. Obaisi that "R knee [illegible] to be completed at UIC." Coleman Medical Records at 10. Coleman does not offer any evidence showing that *Obaisi* then delayed putting in an actual request for an orthopedic consultation. *Compare to Jones v. Simek*, 193 F.3d 485, 491 (7th Cir. 1999) (prison

doctor identified nerve damage but did not personally arrange for nerve specialist consultation until six months later).

From an objective standpoint, too, it is not clear that the three-month delay exacerbated or prolonged Coleman's pain (beyond the baseline level of pain associated with a chronic knee injury). This is evidenced by the fact that, when Coleman actually met with Dr. Chmell in July 2013, Chmell concluded that there were "no new abnormalities" in Coleman's MRI results and "no instability or decrease in range of motion" based on a physical examination of Coleman's knee. DSOF ¶ 16. It is important, too, that Chmell then prescribed essentially the same course of treatment that Obaisi had been prescribing, with the only exception being that Chmell gave Coleman a steroid injection during the consultation. *Id*. This is not like other cases, for instance, where a delay in treatment led to an exacerbation of an injury that could have easily been avoided had the delay not happened. *See Berry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010) (finding deliberate indifference where doctor refused to send prisoner to dentist for tooth decay despite complaints of escalating pain over a two-month period); *Smith*, 666 F.3d at 1040 (finding deliberate indifference where prisoner "bled, vomited, sustained retinal or corneal damage, and endured dizziness and severe pain for five days as guards merely looked on"); *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007) (finding deliberate indifference where prison doctor's delay in treating dislocated finger due to doctor's holiday plans caused permanent disfigurement). The delay between April 2013 and July 2013 does not exhibit deliberate indifference.

## 2. July 2013 Orthopedic Consultation

Coleman's next argument is that when he was finally able to meet with Dr. Chmell in July 2013, Chmell at that time recommended a follow-up visit in four to six weeks. Pl. Resp. Br. at 6. But that follow-up visit did not occur until October 2013, which was three months later than recommended.[11] *Id.* Again, though, there is no evidence that it was *Dr. Obaisi* who was responsible for the three-month delay in securing a follow-up consultation. For instance, Coleman's patient chart reflects that it was *Dr. Chmell* who noted that "we will follow up with him in about 4-6 weeks' time after he has obtained all his imaging." Coleman Medical Records at 13-14. Although not conclusive, this note suggests that the onus might have been on UIC to follow up with Coleman. In any event, it is undisputed that less than one week after Coleman's July 2013 visit with Chmell, Obaisi "obtained approval for the MRI of the right knee and follow-up appointment with Dr. Chmell." DSOF ¶ 17. At that time, Obaisi also renewed Coleman's medical permit for two crutches and a right knee brace, per Chmell's recommendations. *Id.* There is no explanation for why the specialist visit took so long to happen after Obaisi "obtained approval" for the follow-up appointment in July 2013. But in any event, these facts do not support an inference that Obaisi, with deliberate indifference, delayed Coleman's follow-up orthopedic consultation in violation of the Eighth Amendment.

---

[11]For purposes of this discussion, the Court assumes that the October 2013 follow-up visit refers to Coleman's October 2013 visit to Presence St. Joseph's Medical Center, where he underwent an MRI of his right knee. DSOF ¶ 18.

And from an objective standpoint, too, there is no evidence that the three-month delay unnecessarily prolonged Coleman's pain. That is, the record shows that when Coleman actually underwent the MRI in October 2013, the results showed only "minor post-meniscectomy changes," which both parties agree "are common, and would have been expected to produce either minimal, or no knee pain." DSOF ¶ 18. So even if Obaisi were somehow responsible for the delay in accomplishing the follow-up specialist visit, there is no evidence that the delay caused Coleman additional pain. The July 2013 to October 2013 delay in holding the follow-up visit does not amount to deliberate indifference.

### 3. January 2015 Imaging Delay

Moving forward two years, Coleman next notes that "in January 2015, Dr. Chmell recommended various imaging" of Coleman's leg, but "the prison staff did not complete these imaging studies until May 2015. Pl. Resp. Br. at 7. Indeed, Coleman appears to have filed at least four grievances between when he was told he needed imaging and when he actually received imaging. PSOF ¶ 17.

Yet again, though, there is no evidence that this delay in securing imaging for Coleman was caused by *Dr. Obaisi*, or that the delay exacerbated or prolonged otherwise avoidable pain. When Coleman finally underwent an MRI in May 2015, five months after Dr. Chmell's recommendation, the MRI of the right hip revealed a suspected muscular tear, while the MRI of the right knee revealed "a mid-grade chrondral malacia in the medial compartment." DSOF ¶¶ 34, 36. With regard to the hip, the defense expert Dr. Prodromos opined that these types of muscular tears

"virtually never require surgery" and that "certainly Mr. Coleman's minor abnormality would not." R. 84-5, DSOF Exh. 5, Prodromos Report at 7. And with regard to the knee, Dr. Prodromos noted that the MRI results showed only "age-appropriate wear and tear," along with the "post-meniscectomy changes of the meniscus" that had been noted previously. *Id.* But none of these MRI findings, explained Dr. Prodromos, would have necessitated surgical intervention of Coleman's right knee. *Id.*

The takeaway here is that despite the five-month delay, the imaging ultimately does not support an exacerbation or prolonging of Coleman's pain. Imaging, after all, is only a diagnostic tool meant to reveal hidden conditions that might require treatment, so a delay in imaging can be harmful if it delays the ultimate treatment of a hidden injury. But a delay in imaging for the sake of imaging does not necessarily mean that an injury has been made worse. It might be a different matter, for instance, if the MRIs revealed that Coleman had been nursing an extremely serious knee injury that could have been discovered and treated had there not been a five-month-long delay in obtaining the imaging. But that is not the case here. Rather, the MRIs merely confirmed what Dr. Obaisi and Dr. Chmell had previously observed. Indeed, in response to the May 2015 imaging results, Obaisi prescribed Coleman with Indocin (an NSAID). DSOF ¶ 40. This is actually less intervention than the course of treatment prescribed back in January 2015, when the imaging was first recommended; at that point, Obaisi prescribed Indocin, as well as a steroid injection. *Id.* ¶ 33. Of course, there is another important difference between the January

treatment and the May treatment; in May, Coleman attended at least two physical therapy sessions with Becerra. But there is no suggestion that the physical therapy sessions would have been more helpful to Coleman if only he could have started attending earlier. Coleman does not provide any evidence, for instance, that he would have felt well enough to attend physical therapy in February or March 2015, as opposed to in May 2015, when he felt "severe pain" during two of his appointments and then missed the rest of the scheduled appointments. Pl. Resp. DSOF ¶ 39; DSOF ¶ 39. For these reasons, there was no deliberate indifference in the delay of the medical imaging.

### 4. August 2015 Surgical Consultation

Finally, Coleman claims that Dr. Chmell recommended a surgical consultation for him during his August 2015 visit to UIC. Pl. Resp. Br. at 6. This referral, according to Coleman, never occurred. *Id*.

On review of the parties' Statements of Facts, it appears that during the August 2015 visit at issue, Dr. Chmell recommended that Coleman be referred for another orthopedic consultation with a different specialist to further evaluate the suspected gluteus medius tear in his right hip. DSOF ¶ 41. Indeed, Coleman's medical records for the August 2015 consultation with Chmell includes the note: "At this point, we will refer him to Dr. Marcus for possible arthroscopic intervention." Coleman Medical Records at 46. But contrary to Coleman's contention, the consultation with Marcus did actually happen, albeit nine months after the initial recommendation by Chmell. Specifically, Coleman finally met with Dr. Marcus in

May 2016. At this visit, Marcus confirmed that Coleman had a "small gluteus medius tear of the right hip." DSOF ¶ 44. Marcus also noted that Coleman had "some cartilage wear but no meniscal injury." *Id*. In terms of treatment, Marcus administered steroid injections into Coleman's right knee and hip, prescribed him physical therapy, and advised him to follow-up in one year. *Id*.

Once again, Coleman has not offered any evidence that Dr. Obaisi was responsible for the nine-month delay in securing an orthopedic consultation with Dr. Marcus. Indeed, Dr. Chmell's note in Coleman's chart says that "*we* will refer him to Dr. Marcus." Coleman Medical Records at 46 (emphasis added). So perhaps there was an internal delay at UIC, where both Dr. Chmell and Dr. Marcus worked, as opposed to an intentional or reckless decision to delay the appointment by Dr. Obaisi. In any event, Coleman offers no evidence attributing the delay to Obaisi. And similarly, Coleman has not offered any evidence that the delay exacerbated or unnecessarily prolonged his preexisting pain. Importantly, Dr. Marcus did not immediately recommend surgical intervention for Coleman when he finally saw him in May 2016. Instead, Marcus prescribed physical therapy and administered two steroid injections, which was largely the same course of treatment that Obaisi had previously administered back in 2015. DSOF ¶¶ 33, 38. Finally, it is notable that Marcus did not recommend that a follow-up was necessary until one *year* later, which suggests that the orthopedic specialists at UIC considered Coleman's pain as more of a long-term condition, as opposed to an injury that needed frequent and immediate attention. For

these reasons, Coleman has failed to provide evidence that Dr. Obaisi delayed his surgical consultation with deliberate indifference toward Coleman's pain.

## B. Crutches

Coleman also takes issue with Dr. Obaisi's decision to remove him from crutches in October 2014. According to Coleman, "Dr. Chmell recommended that Mr. Coleman use two crutches when walking in the July 2013 appointment, yet Dr. Obaisi took Mr. Coleman's crutches away in October 2014." Pl. Resp. Br. at 7. And then, even though Coleman "filed an emergency grievance the next day," Dr. Obaisi did not return Coleman's crutches. *Id*. at 7. Because he did not have crutches, Coleman argues, he fell down the stairs. *Id*.

The precise sequence of events is as follows. In November 2014, three weeks after Obaisi took away Coleman's crutches, Coleman was heading from his cell (on the second floor) to the showers (on the first floor) and came across a set of stairs. DSOF ¶ 29. According to Coleman, he was "holding onto the bars all the way there," but when he "tried to scan the steps to go down, [his] right knee went out and [his] back was in pain." Pl. Resp. DSOF ¶ 29. He then fell down the steps. When he attempted to reach for the stair railing, it was not there. *Id*.

Coleman cites the Seventh Circuit's decision in *McGowan* for the proposition that "[i]f it is true that the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment, then a jury should be allowed to decide how serious Mr. Coleman's condition was and the ease with which the prison staff could have provided treatment (e.g. failure to provide crutches following Mr.

Coleman's emergency grievance on October 23rd, 2014, three weeks before the second fall)." Pl. Resp. Br. at 5 (referring to *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). But that ignores the context surrounding Dr. Obaisi's decision.

Under the governing deliberate-indifference standard, the question is not simply whether crutches were an "easy" treatment, but rather whether Dr. Obaisi *subjectively* knew that taking away Coleman's crutches would cause his right knee to give out (which then led to Coleman losing his balance and falling down the stairs). On that question, there is no evidence from which a reasonable jury could find that Obaisi was aware of any risk of Coleman's knee giving out in the way that it did. The record shows that Obaisi had mainly been treating Coleman for knee *pain*. And in October 2014 in particular, it is undisputed that Coleman's pain had extended beyond just his knee; since July 2014, he had been feeling pain in his right groin area that Obaisi diagnosed to be tendonitis caused by *overuse* of crutches. DSOF ¶¶ 24, 27. At worst, Obaisi's decision to take away Coleman's crutches represented a calculated decision to prioritize Coleman's tendonitis over his chronic knee pain. And there is no evidence that Obaisi entirely ignored Coleman's knee pain; at the same appointment during which Obaisi took away Coleman's crutches (to address the right groin pain), he also prescribed Coleman an opioid pain medication to specifically address the knee pain. *Id.* ¶ 24. Ultimately, without a reason to think that Coleman's knee would buckle in the way that it did, the decision to take away the crutches does not amount to deliberate indifference. *See McGowan*, 612 F.3d at 641 ("But in the end, this

dispute is over nothing but the choice of one routine medical procedure versus another, and that is not enough to state an Eighth Amendment claim.").

And for what it is worth, it is not clear that crutches objectively make stairs safer. Dr. Prodromos, for instance, opined that "crutches on stairs are quite dangerous and are associated with causing falls." Prodromos Report at 5-6. Not only that, but Dr. Prodromos doubts whether crutches were even necessary for "typical, age appropriate, post-surgical knee degenerative changes." *Id*. This expert opinion is echoed in Coleman's personal experiences. After all, when Coleman originally fell down the stairs back in 2011, he had been using a crutch. DSOF ¶ 9. Thus, even viewing the evidence in Coleman's favor, Dr. Obaisi was not deliberately indifferent to Coleman's knee pain when he made the decision to take Coleman off crutches in October 2014.

## IV. Conclusion

The Court does not doubt Coleman's subjective experiences of chronic pain. But that is precisely one of the problems here—the pain was chronic. As a result, it is difficult to pinpoint any individual action or delay by a physician as the precise cause for the unnecessary and avoidable continuation of pain or the exacerbation of injury. Indeed, Dr. Obaisi continued to monitor him, prescribe him pain medication, secure imaging, and send him out for specialist referrals over the course of six years.[12] Even

---

[12]Defendant also argued that Coleman's punitive damages claim should be dismissed. Def. Br. at 10. Because Coleman did not address this argument in his response brief, the claim is dismissed for that reason alone. But even if Coleman had addressed it, the punitive damages claim would still need to be dismissed given that Coleman has failed to survive summary judgment on the underlying deliberate-indifference claims.

giving Coleman the benefit of reasonable inferences, a jury cannot find that Obaisi was deliberately indifference to Coleman's medical needs. Thus, the motion for summary judgment is granted, and the Court will enter final judgment. The status hearing of April 2, 2020 is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 22, 2020